A. H. Hitchler et ux. v. T. H. Scanlan et al.

Delivered December 24, 1896.

1.  Deeds—Certainty of Description—Lapse of Time—Possession.
Where land was described in certain deeds by lot numbers, according to a plat which was not in evidence or testified to so as to identify the lots, further than that they were part of the tract described in the deeds as covered by the plat, and where the grantees took possession of parts of the tract under the deeds, and have since held such possession for 45 years, 20 years of which was during the life of the grantor, who had knowledge thereof, it will be presumed that the parts so taken possession of was the land described, and hence the deeds are not void for uncertainty of description.

2.  Unrecorded Deed—Notice of Claim—Innocent Purchaser.
Where commissioners appointed to partition the land of F., deceased, sold only the interest of the estate therein, one subsequently buying the same title with knowledge that another is claiming the property, but without actual knowledge of his unrecorded deed, is not an innocent purchaser.

3.  Evidence—Deeds Containing Latent Ambiguity.
Deeds unambiguous on their face, but in which a latent ambiguity of description was developed on the trial, were properly admitted in evidence, since the other evidence might be sufficient to remove the ambiguity; and were properly retained in evidence, when the other evidence was so sufficient.

4.  Same—Recitals of Deeds for Identification.
In trespass to try title, recitals of general description contained in defendant's deeds, though not binding upon plaintiffs, are yet admissible to aid in the identification of the land conveyed.

Error from Harris. Tried below before Hon. S. H. Brashear.

*Chas. E. Dwyer, G. M. Tharp* and *Jones & Garnett* for plaintiffs in error.

*E. P. Hamblen,* for defendants in error.

GARRETT, Chief Justice.—On September 5, 1888, A. H. Hitchler, joined by his wife, Mary Hitchler, brought an action of trespass to

try title in the District Court of Harris County against T. H. Scanlan, Rufus K. Cage and Harriet S. Sellers, to recover of them lot No. 11 of the upper half of the Luke Moore league, situated in Harris County, less 15 acres, described by metes and bounds, which had been conveyed by S. M. Frost to Parker & Donovan out of the northeast corner of said lot. S. M. Frost was common source of title. November 7, 1889, M. D. Milsap, joined by her husband, W. J. Milsap, and G. T. Jaeger, intervened in the cause, and sought to recover of both plaintiffs and defendants lots Nos. 11 to 18, inclusive, of said league lot No. 11. A trial was had, which resulted in a judgment in favor of the defendants, which on appeal was reversed by the Supreme Court in Hitchler v. Scanlan, 83 Texas, 569.

After the cause had been remanded for another trial, the defendant Scanlan, who had in his answer disclaimed as to all of the league lot 11 except 58 acres, the description of which he set out by metes and bounds, obtained a severance from his co-defendants, and a trial was had as to the 58 acres claimed by him, which again resulted in a verdict in his favor. To reverse this judgment, a writ of error was sued out by Hitchler and wife, and it is now before this court for revision.

As above stated, S. M. Frost was common source of title. He died testate in the year 1866. Proceedings for the partition of his estate were had in the District Court of Fort Bend County, and a decree was made and commissioners were appointed by the court to make partition of said league lot No. 11. The commissioners reported to the court that they were not able to make partition of said lot, because they could not ascertain what part of it belonged to the estate. It was thereupon ordered by the court that the interest of the heirs of the estate of S. M. Frost, deceased, be sold for partition, and M. W. Garnett was appointed as commissioner to make sale, for that purpose, of the right, title, claim, and interest of the heirs and devisees of the said S. M. Frost, deceased, "and the estate of S. M. Frost in and to said lot No. 11 in the Luke Moore league, out of the upper half thereof."

The special commissioner named in the above recited order of court sold, in accordance therewith, to W. P. Hamblen, for a consideration of $50, "all the right, title and claim and interest of John Wharton Frost, Mary Frost, J. M. Frost, F. P. Frost, H. E. Frost, and the estate of S. M. Frost, deceased, in and to that certain tract of land situated near the city of Houston, in Harris County, Texas, and known as lot No. 11 in the Luke Moore survey, and taken out of the upper half thereof; said interest being estimated at 68 acres of land." The sale was confirmed by the court, and the deed bears date July 27, 1875.

On December 1, 1875, W. P. Hamblen conveyed to Virginia M. Frost, in consideration of $50, and that the same was bought by him in trust for said Virginia M. Frost, all of his right, title, claim, and interest in and to the land as described in the foregoing deed.

All of the right, title and interest of Virginia M. Frost in and to said lot No. 11 was levied on and sold by the sheriff of Harris County, by

virtue of an execution issued out of the District Court of Fort Bend County upon a judgment against the said Virginia M. Frost rendered October 12, 1874, to N. Mayblum, one of the plaintiffs in execution, upon his bid of $25. The sheriff's deed is dated February 1, 1876. No payment of the amount of the bid is shown.

N. Mayblum died, leaving Sophia Mayblum as his sole heir, and on August 14, 1888, she conveyed to the plaintiff Mary Hitchler all of her right, title, and interest in and to the lot 11 as before described, for a consideration of $225, which was paid.

The deeds from Hamblen to Virginia M. Frost, and from Sophia Mayblum to Mary Hitchler, purport to "grant, bargain, sell, and convey," and contain covenants of special warranty of title against claims under the grantor only.

The defendant Scanlan introduced in evidence a number of deeds, from the recitals of which it appears that the league lot No. 11 had been subdivided by Frost into 66 small lots after the conveyance of the 15 acres by him to Parker & Donovan. These small lots, according to a plan made by one Herman, contained 2 or 2½ acres each, and were numbered from 1 to 66, inclusive. The map or plot of this subdivision was not in evidence, and no witness testified who had ever seen it or could certainly identify the lots upon the ground.

Deeds were introduced in evidence showing that, according to lot numbers, S. M. Frost had conveyed to various persons in his life time all of league No. 11 except lots Nos. 1 and 2 of the subdivision thereof; but the plaintiffs contend that these deeds are void for uncertainty, because the lots which they purport to convey cannot be located or identified on the ground.

The deeds executed by Frost after the conveyance of the 15 acres in the northeast corner, were as follows: (1) S. M. Frost to Jesse Randell, recorded April 18, 1839, purporting to convey lots 3 to 10, inclusive, containing 16 acres, out of lot 11, according to Herman's plot, etc. (2) S. M. Frost to R. S. Redman, dated May 29, 1839, duly recorded on the same day, purporting to convey lots 11 to 19, containing 18 acres, according to the plan of F. W. Herman, and being part of lot No. 11. (3) S. M. Frost to R. C. Ingraham, recorded March 1, 1841, purporting to convey lots 20 to 39, inclusive, each containing 2 acres, more or less, being part of lot No. 11. (4) S. M. Frost to R. C. Ingraham, dated June 9, 1841, but not recorded until October 17, 1892, after the purchase by the plaintiff Mary Hitchler and the first trial of this case. This deed purported to convey lots 40 to 66, inclusive, out of lot No. 11, and recited a vendor's lien for unpaid purchase money.

Lots 11 to 19 passed by mesne conveyances from R. S. Redman to R. C. Ingraham. They were also conveyed to him by Harriet George, whose deed recited that they had been sold at execution sale, as the property of Redman, to B. Canfield, and set apart to her in the division of Canfield's estate.

R. C. Ingraham conveyed to A. P. Thompson, by a general warranty

deed dated March 17, 1846, and recorded April 11, 1846, ɪots 11 to 39, inclusive, as the property then owned and occupied by the grantor as a residence.    Prior to this conveyance, on March 23, 1844, Ingraham executed a mortgage to A. B. Worsham upon lots 19 to 66 inclusive, each containing 2½ acres, part of the Luke Moore survey, including Ingraham's improvements where he then resided.

A. B. Worsham acquired the title to the lots included in the foregoing mortgage at a foreclosure sale against Ingraham April 3, 1849.

There is nothing to show that the title to lots 11 to 19, inclusive, was ever divested out of A. P. Thompson.    The interveners M. D. Milsap and G. T. Jaeger are his sole heirs.    But the conveyance from Harriet George to Ingraham for lots 11 to 19 appears to have been executed October 30, 1854, long after the conveyance by Ingraham to Thompson.

A. B. Worsham, by deed recorded July 31, 1849, conveyed to H. H. Cone lots 19 to 56, inclusive, each containing 2½ acres, according to the map of Herman, out of lot 11.    He also conveyed to E. A. Palmer, by deed recorded July 16, 1849, land described as lots 56 to 66, inclusive, each containing 2½ acres, "being the land on which Ingraham now resides, adjoining land sold by me to H. H. Cone, being part of lot 11."

H. H. Cone conveyed to R. C. Ingraham, by deed recorded July 9, 1853, lots 51 to 56, inclusive, each containing 2½ acres, out of lot 11, "adjoining the land purchased by Ingraham from E. A. Palmer, so as to leave a straight boundary between the parties."    E. A. Palmer conveyed to R. C. Ingraham, by deed recorded July 12, 1853, land described as "lots 51 to 66, inclusive, each containing 2½ acres, part of lot 11, and known as the 'Old Ingraham Track.'"

Assuming that the lots into which league lot No. 11 had been subdivided can be identified upon the ground, the record shows that the title to lots 51 to 66 was reinvested in R. C. Ingraham after they had been sold and conveyed to A. B. Worsham in the foreclosure proceedings. The defendant Scanlan claims the land in controversy through a deed from R. C. Ingraham to him and H. J. Trube, dated, acknowledged, and filed for record June 19, 1862, which purported to convey 58 acres, more or less, by metes and bounds, containing in addition the following further description:    "25 acres of said land having been conveyed to me by E. A. Palmer, by deed recorded on book P, page 346; 15 acres by H. H. Cone, by deed recorded in book A, p. 490; and 18 acres of which were conveyed to me by Harriet George, by deed dated October 30, 1854, and not yet recorded; and the 58 acres herein conveyed are the identical tract of land referred to in said deeds."    This deed, then, from the description by reference to the deeds mentioned in it, purports to convey lots 11 to 19, and 51 to 66, by metes and bounds to include them all.    Trube conveyed his interest to Scanlan on August 8, 1863.

The evidence showed that Ingraham had taken possession of the

land and resided on it as far back as 1845. He inclosed a large portion of it, and in 1862, when Scanlan bought, all of the land conveyed to him was inclosed except a small strip on the south side of Slaughter Pen bayou. Looking to the recitals in the deeds and the testimony of the witnesses, we conclude that the evidence is sufficient to identify the lots 11 to 19 and 51 to 56 upon the ground as embraced in the metes and bounds of the tract claimed by the defendant Scanlan; and that, from all the facts and circumstances in evidence, it should be presumed, after so great a lapse of time, that Ingraham took possession of the property in controversy as the lots mentioned in the deeds made by Frost to Redman and himself, and that the property in controversy is a tract composed of said lots.

When Scanlan bought the land, it was nearly all inclosed, but the fences were soon afterwards destroyed, and no one was in actual possession of it until shortly before the filing of this suit, when he had it inclosed. Plaintiff A. H. Hitchler acted as the agent of his wife in the purchase of the land from Sophia Mayblum. Before he made the purchase he had a conversation with Scanlan, in which he told Scanlan that Mrs. Mayblum had an adverse title, which Scanlan could get for $200. Scanlan told Hitchler he had bought the land and paid for it, and did not want to buy any other title. Hitchler knew that Scanlan claimed to own the land when he bought it for his wife, but neither he nor his wife had any actual knowledge of the unrecorded deed from Frost to Ingraham.

The verdict of the jury was in favor of the defendant T. H. Scanlan, both on his title and plea of limitation of three years, and judgment was rendered in his favor for the land in controversy on his plea in reconvention. We shall therefore inquire whether the affirmative judgment in favor of the defendant should stand. In the view we have taken of the case, it is not necessary to consider the question of limitation. The defendant has shown title to the lots numbered 51 to 66, if by an application of the description, as such, in the deeds purporting to convey them, to the property in controversy, they can be identified as a part thereof, unless the plaintiff Mary Hitchler should appear to be an innocent purchaser of the land, and not of such claim only as the Frost estate had, having no notice of the unrecorded deed from Frost to Ingraham for the lots 40 to 66. The title to the lots 11 to 19, subject to identification, however, was divested out of Frost by his deed to Redman, and appeared from the evidence to be in the interveners Milsap and Jaeger, as the heirs of Thompson, to whom Ingraham had conveyed. But the interveners have not appealed, and, although before this court as defendants in error, do not complain of the judgment against them in favor of the defendant Scanlan. These lots, then, will be dismissed from consideration, in determining whether or not the judgment below should be permitted to stand.

As before stated, we believe that the evidence adduced at the trial was sufficient to identify the property in controversy as the lots men-

tioned in the several deeds from Frost and in the mesne conveyances down to Scanlan, numbered 11 to 19 and 51 to 56, inclusive; and in addition to this conclusion, we further think these lots should be presumed to be identical with the land in controversy, from the lapse of time since the land was taken possession of, as being the same conveyed by the deeds describing them by the lot numbers, and other facts and circumstances in evidence. The three deeds to Ingraham under which he claimed the land all appear to have been executed in the year 1841, within a very short time of each other; and the evidence shows that, claiming under them, he took possession of the property as far back as 1845, and resided thereon, dealing with it by the lot numbers in all of several transactions, until the year 1862, when he executed the deed to Scanlan, conveying it by metes and bounds, and at the same time describing it by reference to the several deeds in which the land conveyed was described by lot numbers. So for nearly 45 years before the institution of this suit, and for 20 years during the life-time and with the knowledge of Frost, the land had been marked, treated, and dealt with as the same described by the lot numbers in the deeds of Frost and others.

From the proceedings had in the District Court of Fort Bend County, it appeared that only such claim or title as the estate of Frost had to the league lot 11 was sold. The report of the commissioners appointed by the court to make partition showed that they were unable to do so, because they could not ascertain what part of the lot belonged to Frost's heirs, whereupon the court ordered that the interest of the heirs be sold for partition. It was sold and bought by W. P. Hamblen for the widow Virginia M. Frost; bought by Mayblum at execution sale against her, without any evidence of payment of a valuable consideration; and finally bought by the plaintiff, with knowledge that Scanlan was claiming the land. She cannot be deemed either a purchaser of more than such title as the estate of Frost had or an innocent purchaser of the land, if it should be held that the land itself, and not only the interest of the estate therein, was sold. Hence Scanlan's title is not affected by the fact that the deed from Frost to Ingraham for lots 39 to 66 had not been recorded.

Upon the trial plaintiffs objected to the admission in evidence of the several deeds from Frost and others, conveying the land by lot numbers, and, after they had been admitted by the court, and the evidence had been closed, plaintiffs moved to strike them out as evidence in the case, because there was no evidence to locate or identify the lots purported to be conveyed, and they were void for ambiguity of description. There is no ambiguity patent upon the face of the deeds, and whatever ambiguity there may be is such latent ambiguity as might arise from the evidence in applying the description in the deeds to the land in controversy. There was no error in admitting the deeds in evidence, because they purport to convey certain lots of land which by the evidence might be identified; and there was no error in refusing to

strike them out after the evidence had been closed, because the evidence of identification offered was sufficient to go to the jury, and, as we have already held, sufficient to support the verdict identifying the lots as the property in controversy. Holding, as we do, that the evidence was sufficient to identify the lots, disposes of quite a number of the assignments of error made by the plaintiffs in error, which we shall not consider in detail.

The recitals of general description contained in the deeds were admissible to aid in the identification of the lots. Plaintiffs were not bound by such recitals, but they were evidence to show what land the deeds conveyed, whether found in the plaintiffs' chain of title or not. The deeds being admissible either as evidence of title or to show the location of adjoining tracts, the descriptive recitals therein were admissible as assisting in the identification, and to show title out of Frost.

There is some difficulty about the admission of the evidence of W. P. Hamblen as to the call in the Kennedy deed, which was not produced, for the north line of league lot 11. We do not think, however, the evidence could have affected the verdict. Hamblen, in explaining the manner in which he and the surveyor Gillespie ran out and identified the land in controversy, stated that they threw off a sufficient distance to allow for the Kennedy lots about which there was no controversy, and found that it coincided with the corner established by Ingraham. If we are correct in holding that it should be presumed from the evidence, after so great a lapse of time, that Ingraham was in possession of the lots called for in his deeds, the evidence objected to cannot affect the correctness of the result reached.

Since we hold that Mary Hitchler took only such title as the estate of Frost had in the land, and also had notice of the unrecorded deed, the errors assigned upon the charge of the court and the exclusion of the evidence upon this phase of the case became immaterial. And as we hold that Scanlan showed title to the property, errors, if any, in regard to the submission of the question of limitation become immaterial also. The evidence in the case shows that all of the lot 11 had been conveyed by Frost in his lifetime except the lots 1 and 2, a very inconsiderable proportion thereof, and that these could not be contained in the property in controversy.

We can see no reason why the judgment below should not be affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

It appears from the record, as stated in the motion for rehearing, that the payment of the purchase money by Hamblen and Mrs. Frost was admitted. But there was no evidence whatever that Mrs. Frost bought without notice of Ingraham's claim. The purchase by Hamblen was for her benefit, and whether or not he had notice is immaterial, though

it was not shown that ne did not have notice. On the other hand the facts show that Mrs. Frost knew of Ingraham's claim. He sold to Scanlan and Trube, and moved off the land, about the time she became acquainted with it. She knew the Ingraham place, and though she testified that the land upon which Frost was cutting timber was the land sued for, and lay south of it, there can be no doubt about the identity of the Ingraham tract with the land claimed by Scanlan and in controversy in this suit.

The motion for rehearing is overruled.

March 11, 1897.                              *Rehearing denied.*